**ST. PETERSBURG BANK & TRUST COMPANY, Plaintiff-Appellee,**

v.

**Bernard L. BOUTIN, etc., et al., Defendants-Appellants.**

**No. 29135.**

United States Court of Appeals, Fifth Circuit.

June 24, 1971.

Bernard H. Dempsey, Jr., Asst. U. S. Atty., Tampa, Fla., Robert V. Zener, Michael C. Farrar, Attys., Dept. of Justice, Washington, D. C., William D. Ruckelshaus, Asst. Atty. Gen., John L. Briggs, U. S. Atty., Washington, D. C., for defendants-appellants.

Edward I. Cutler, Tampa, Fla., Thomas M. Tucker, St. Petersburg, Fla., H. Diane Breithaupt, Tampa, Fla., Harrison, Greene, Mann, Davenport, Rowe & Stanton, St. Petersburg, Fla., and Carlton, Fields, Ward, Emmanuel, Smith, & Cutler, P.A., Tampa, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

The Bank sued SBA on that agency's guarantees of two separate $150,000 loans made by the Bank to the now-bankrupt Caladesic Capital Corporation.[1] After a nonjury trial the Bank secured judgment on both guaranties for the full amount of $300,000. We conclude that the court erred in holding SBA liable on the first guaranty issued, but correctly held it liable on the second, and, as modified, affirm.

Each of the two loan transactions was handled as follows. Caladesic and SBA entered into a loan agreement. Cala-

---

1. A Small Business Investment Company, licensed and regulated by SBA.

desic executed a promissory note payable to SBA, which stated that it was executed pursuant to the loan agreement. By a written assignment agreement, executed by SBA and the Bank, SBA assigned the note and loan agreement to the Bank. The Bank disbursed its funds to Caladesic. Under each loan agreement, the Bank could reassign the note at any time to SBA, and SBA would pay it the outstanding principal. Commencement of receivership or bankruptcy against Caladesic operated as an automatic reassignment, and the Bank was then obligated to pay the outstanding principal. Caladesic was put in receivership, then declared bankrupt. SBA declined to pay the Bank, claiming that it had been discharged as guarantor, and this suit ensued.

Federal common law controls the relationships and rights of the parties, First National Bank of Henrietta v. SBA, 429 F.2d 280 (5th Cir. 1970); W. T. Jones & Co. v. Foodco Realty, Inc., 318 F.2d 881 (4th Cir. 1963). Throughout the suit the parties have referred to SBA's status as that of guarantor and its obligation to repurchase the notes as one of guaranty, and have recognized that SBA is compensated. No particular form of words is required for a guaranty. We think the parties' characterization is correct.

There are four relevant loans made by the Bank to Caladesic:

> June 11, 1964: first SBA-guaranteed loan of $150,000.
>
> September 25, 1964: non-SBA loan of $150,000.
>
> December 28 (or 31), 1964: non-SBA loan of $100,000.
>
> February 12, 1965: second SBA-guaranteed loan of $150,000.

There was no collateral pledged or mortgaged for the first SBA-guaranteed loan. However, availability of collateral was provided by the loan agreement, which contained a "set aside" provision requiring Caladesic to segregate in its files and earmark with a distinguishing mark eleven securities with a face value of $610,000, and not to pledge or otherwise encumber them without prior written approval of SBA, and, on demand of SBA, to assign them as collateral for the loan. The securities were listed on a schedule attached to the loan agreement, and were described in detail.[2] The assignment agreement provided that neither the Bank nor SBA could change any provision of the note or the loan agreement without the consent of the other.

The assignment was executed on behalf of the Bank as assignee by its vice president-cashier, who "inspected" or "perused" or "scanned" it and the other loan documents and sent them to the Bank's attorney for his inspection. The same officer also handled all the subsequent loan transactions with Caladesic. The loan documents were placed in the Bank's files and have remained there.

Receivership proceedings were instituted against Caladesic in March, 1966, and it was adjudicated bankrupt in October, 1966. SBA made no recovery in bankruptcy.

The controversy over whether SBA was relieved of its obligations as guarantor arises from the fact that after the first guaranteed loan was closed, and before the second, and without SBA's knowledge, the Bank, on September 25 and December 28, 1964 made the two nonguaranteed loans to Caladesic, and as collateral took pledges of a substantial portion of the set aside securities, which the Bank still retained at the time of trial.[3] They were pledged and delivered in connection with the nonguaranteed loan of September 25. The District

---

2. All were debt instruments, promissory notes payable to Caladesic by firms to which it had made loans. Nine of the eleven were supported by first mortgages on real estate. Two had face values of $10,000; one of $40,000; one of $50,000; five of $60,000; one of $80,000; and one of $120,000.

3. No claim is made to this court that the Bank's actions were fraudulent or invidious. Its officer, who handled all the relevant transactions, characterized his actions as "stupid."

Court made no findings as to their number and amount, but an officer of the Bank testified to holding eight of the set aside securities, all secured by real estate mortgages. Since only nine were secured by mortgages, it would appear, by deducting the largest and the smallest of the real estate notes from the total of the nine, that the Bank held securities with face values between $470,000 and $550,000.

The nonguaranteed $100,000 loan made December 28 was secured by corporate stock owned by the president of Caladesic and (under cross-collateral agreements) by the set aside securities pledged for the September 25 loan. When the second SBA-guaranteed loan was closed, the September 25 loan was discharged out of the proceeds. At that time the president's corporate stock was released as collateral for the $100,000 loan, leaving the set aside securities still pledged for that loan.

At no time prior to the closing of the second guaranteed loan did the Bank notify SBA that set aside securities had been assigned to it.

 The Bank's actions discharged SBA of liability on the first guaranty.

§ 128. Modification of principal's duty.

Where, without the surety's consent, the principal and the creditor modify their contract otherwise than by extension of time for payment

\* \* \* \* \* \*

(b) the compensated surety is

(i) discharged if the modification materially increases his risk, and

(ii) not discharged if the risk is not materially increased, but his obligation is reduced to the extent of loss due to the modification.

Restatement of Security § 128; Trinity Universal Ins. Co. v. Gould, 258 F.2d 883 (10th Cir. 1958); Logan v. Clark, 63 F.2d 973 (4th Cir. 1933). This is simply a more specific application of the general principle that, since a suretyship obligation is imposed only with the express consent of the promisor, he is entitled to stand upon the strict terms of his undertaking, and a new contract may not be substituted for the old one without his consent. Stearns, The Law of Suretyship, § 6.2. (Elder ed.) Modification need not be accomplished by changes in the language of the instrument but may be by material departures from its terms in its execution and enforcement. Reliance Ins. Co. of Phila. v. Colbert, 124 U.S.App.D.C. 339, 365 F.2d 530 (1966); 10 Williston on Contracts (3d ed.) § 1243; Restatement of Security § 128, Comment b; Stearns, The Law of Suretyship, § 6.6 (Elder ed.)

The material increase in risk to the surety is evident. The set aside agreement safeguarded the securities as a source of collateral for a loan otherwise unsecured, without the necessity of their being assigned to and held in the lender's files. The amount was substantial, $610,000 face value on a $150,000 loan. Had the Bank exercised its right to assign the note back to SBA, that agency would have found itself with no security available to it, and with the security agreed to be available in the hands of the Bank as a secured creditor of Caladesic on subsequently made loans, or else SBA would have found itself in a lawsuit with the Bank over release of the security (a lawsuit which, in fact, it is already in, in the form of a pending separate action to determine the rights of the parties to the securities, discussed *infra*). SBA would have been in a like posture had it exercised its right under the loan agreement to declare the note due at once because of the breach of the security arrangement.

██ The restriction also protected SBA against Caladesic's further extending its credit. While owing $150,000 on the first SBA-guaranteed loan, Caladesic, by use of the restricted securities (alone and with the temporary aid of its president's stock) obligated itself for an additional nonguaranteed $150,000, increased

to $250,000, then reduced to $100,000. Whether these additional loans caused or contributed to Caladesic's bankruptcy we do not know, nor is SBA required to prove it—its right is to be protected against a substantially different risk of loss. Restatement of Security § 128, Comment f.

Payment of the nonguaranteed loan of September 25 did not eliminate the material increase in risk. The December 28 loan remained unpaid. Also the September 25 loan was the first step in the chain of dealings by which the restricted securities were placed with, and have remained with, the Bank as collateral.

■ The Bank states that at all times it has been ready to turn over the securities free of encumbrance or lien "if required to do so." In fact it has sought in a separate action a determination of the respective rights of the parties to the securities which it holds, and it sought unsuccessfully in the present action to amend so as to secure a judgment against SBA on the guaranties conditioned on the Bank's transferring to SBA such interest in the securities as the court might determine SBA is entitled. It is, to say the least, an unusual theory, and supported by no cited authority, that the creditor who has breached its obligations so as to relieve the guarantor before the events occur which otherwise would have made the guarantor liable, may, after the events occur, and if it wishes to do so, put Humpty Dumpty together again and restore the liability of the guarantor. Even if unconditionally made, the Bank's belated gestures would not breathe back life into the discharged guaranty.

■ The Bank may not escape the consequences of its action by its claim that it had no knowledge that the securities which it took as collateral were forbidden to be pledged. The District Court found that the Bank was "not actually aware" of the restricted character of the securities and that it did not "knowingly participate" in a breach or change of the loan agreement. Whether the Bank was at the moment "aware" of

matters of which it had knowledge is of no legal relevance. The Bank either had knowledge, or is chargeable with knowledge, and if the finding of no "knowing participation" means lack of knowledge rather than lack of awareness, it is plainly erroneous.

[N]either a large bank nor a small bank may urge that it is ignorant of facts clearly disclosed in the transactions of its customers with the Bank —disclosed, too, without the need of artificial synthesis of notice of separated operations; nor may a bank close its eyes to the clear implications of such facts.

Grace v. Corn Exchange Bank Trust Co., 287 N.Y. 94, 107, 38 N.E.2d 449, 454 (1941). To recapitulate, the Bank had in its files the note, the loan agreement and the assignment agreement. The note referenced the loan agreement. The loan agreement contained the set aside provision, and attached to it was the list of set aside securities. The assignment transferred to the Bank the note and the loan agreement and, in addition, imposed on the Bank the obligation (imposed upon it in any event as a matter of suretyship law) not to alter the terms of note or loan agreement without consent of SBA. The vice president-cashier handled the closing of the guaranteed loan and signed the assignment agreement for the Bank. He examined the documents and sent them to the Bank's attorney for further examination. The Bank is in the anomalous position of disclaiming knowledge of the contents of the very document on which it sues.

■ One who reads a written document, or signs it (even without reading it) is bound by its terms. "Although the plaintiff testified that he merely 'glanced' at this instrument [a release, in the form of a letter signed by him], it is the universal rule that he cannot thus evade his responsibilities for its terms and conditions." Lawrence v. Muter Co., 171 F.2d 380, 384 (7th Cir. 1948). See also: 1 Williston on Contracts (3d ed.) § 90A; Restatement of Contracts § 70. There is no issue of imputing knowledge of one officer to the corporate en-

tity and thence to another officer—the same officer handled all the loan transactions with Caladesic.[4]

The Bank misses the point by its argument that it had no affirmative duty to oversee Caladesic's affairs so as to insure that Caladesic abided by the set aside provision. The question here is a much narrower one of the effect of a breach of the security arrangement participated in by the Bank itself and to its own advantage.

The individual set aside securities were not identified with distinguishing marks. The trial court found that SBA "waived the requirement in the loan agreement that the earmarked securities be identified by a distinguished mark." The loan agreements required:

> The Earmarked Securities shall be identified by a distinguishing mark to indicate that they are subject to this Loan Agreement and they shall be physically separated from portfolio securities which are not earmarked.

SBA has not construed this to require that each document must bear a distinguishing mark. Rather it has uniformly required of Small Business Investment Companies that all restricted securities be maintained in a single file or portfolio, separate from other securities, which file must be marked to show that the contents are earmarked securities. This construction by the agency, and uniform practice of the agency, is entitled to appropriate judicial respect and deference, North Atlantic Westbound Freight Assn. v. Federal Maritime Commission, 130 U.S.App.D.C. 122, 397 F.2d 683 (1968), and it excludes a conclusion that there was a waiver.

The discharge of SBA on the first guaranty is not pro tanto but total. Because there was a material increase in the risk, the case falls under § 128(b)(i) of the Restatement rather than (b)(ii), which provides for reduction in the surety's obligation if the risk is not materially increased.[5]

On the guaranty issued for the second SBA-guaranteed loan, it is SBA's ox which is gored by knowledge. See E. A. Boyd Co. v. U.S.F. & G., 35 Cal. App.2d 171, 94 P.2d 1046 (1939). The court correctly held SBA liable. The loan agreement was made in early December, 1964, and in February, 1965 the loan was closed in the same manner as the first loan.[6] SBA's claim of discharge

---

4. While not essential to liability, it is worth noting that the vice president-cashier acknowledged that normal practice in making a sizable loan was to check the borrower's loan history, but that was not done in Caladesic's case. He testified also that he would have no interest in the provision concerning earmarking securities, that the Bank was "looking to * * * the Government's guarantee to assure repayment." Another officer testified there was no need to examine the papers on SBA-guaranteed loans before making further loans to Caladesic because the loans were "guaranteed by the Government."

5. Section 132 of the Restatement, which covers surrender or impairment of security by the creditor, provides:

 "Where the creditor has security from the principal and knows of the surety's obligation, the surety's obligation is reduced pro tanto if the creditor

 (a) surrenders or releases the security

 or

 (b) wilfully or negligently harms it,

 or

 (c) fails to take reasonable action to preserve its value at a time when the surety does not have an opportunity to take such action."

 We need not decide in this case whether § 132 has application at all where the security arrangement is one required by the guarantor as an incident of its undertaking (as opposed to security agreed upon between principal and creditor), and, if it does, whether it overrides the discharge provision of § 128(b)(i). In this instance the creditor's action, in securing itself on subsequent nonguaranteed loans by draining off the available security, was much more egregious than a release alone.

6. The securities then agreed to be set aside did not include any of those previously specified for earmarking, and none of this second group was accepted by the bank as collateral on any non-guaranteed loan.

on the second guaranty rests on Restatement of Security, § 124(1).

Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

True, the Bank was possessed of knowledge of facts that materially increased SBA's risk. However, after the set aside securities had been turned over to the Bank as collateral, but before the second loan agreement was made, SBA conducted an examination of Caladesic at Caladesic's premises. SBA did not produce the persons who made the examination but contends that, because they did not report the securities (then in possession of the Bank) as missing, the trial court was required to infer that the examiners failed to check for the presence of the securities, and, therefore, never learned of their absence. The trial court was not required to draw that inference. What it did find was that the examination necessarily would disclose the absence of the set aside securities, and, alternatively, that SBA knew or had reason to know of their absence. The record adequately supports the finding that the examination necessarily would disclose the fact of absence, and the alternative finding that there was actual knowledge.

SBA's procedures manual for its examiners instructed them to review an examined company's portfolio of loan and security documents, to confirm the unpaid balance on each debt instrument and to see if each instrument was properly executed, and to verify securities held in safe deposit or safekeeping. A Financial Specialist of SBA testified that determining whether the earmarked securities were in Caladesic's possession was part of the examiners' job. The Deputy Administrator of SBA testified that determining whether set aside securities were in fact earmarked was one of the principal reasons for examining a licensee, and that looking at the securities themselves was "normal auditing procedure." Any one of several of these duties required the examiners to ascertain the presence, and physically examine, the restricted securities, all of which were debt instruments payable to Caladesic.

Subsequent events support a conclusion that either the examiners conducted such examinations as would reveal that the securities were not there, or else examined the securities at the Bank. SBA wrote Caladesic concerning deficiencies revealed by the examination and in its letter said that the examination had included a review of Caladesic's loan and investment files, and discussed specific deficiencies in at least six of the eleven loan transactions covered by the restricted securities. Also one of the objections subsequently voiced by SBA to Caladesic's operation was its failure to exercise dual control by two bonded persons over securities in safekeeping, which would include earmarked securities.

The government urges upon us that any fact not affirmatively reflected on the face of a record is a "fact unknown to the surety" under § 124(1). That contention must, of course, be rejected. The fact of absence of a vital record that one has been instructed to examine can be communicated by many means other than a written entry stating that what is supposed to be there is somewhere else.

The judgment for the appellee is amended to the sum of $150,000, and as amended is affirmed.