**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-20769
_____

STUART G. HAYNSWORTH, et al.,

                              Plaintiffs-Appellants,

VERSUS

THE CORPORATION, a/k/a Lloyd's of London,
a/k/a Lloyd's, a/k/a the Council of Lloyd's,
       a/k/a the Society of Lloyd's,
       a/k/a the Committee of Lloyd's,

                              Defendant-Appellee.


* * * * * * * * * * * * * * * * * * * * * * * *


_____

No. 96-20805
_____

CHARLES ROBERT LESLIE,

                              Plaintiff-Appellee,

VERSUS
LLOYD'S OF LONDON, ETC., ET AL.,

                              Defendants,
LLOYD'S OF LONDON, a/k/a the Corporation of Lloyd's,
    a/k/a Lloyd's, a/k/a the Society of Lloyd's,
       a/k/a the Committee of Lloyd's,

                              Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
August 29, 1997


Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


These are consolidated appeals in suits by individual underwriters against the Corporation of Lloyd's ("Lloyd's"),[1] the central administrative body of the insurance market known as Lloyd's of London.  In No. 96-20769, Stuart Haynsworth and thirty-three others appeal the dismissal of their suits based on a contractual forum selection/choice-of-law clause and, in the alternative, *forum non conveniens* ("f.n.c.").  In No. 96-20805, Lloyd's appeals the refusal to dismiss on the same grounds.  Concluding that the parties are bound by the contracts they entered into, we affirm the judgment of dismissal in No. 96-20769 and reverse and render a judgment of dismissal in No. 96-20805.


I.

Some background as to the nature and structure of Lloyd's of London is a necessary introduction to the issues.  Lloyd's is a

_____

[1] We employ this shorthand with the recognition that, strictly speaking, Lloyd's of London is simply a trademark referring to a market for insurance, and the Corporation of Lloyd's the entity that governs that market.  For convenience, however, we use "Lloyd's" throughout this opinion to refer collectively to the various defendants in both appeals, distinguishing between separate entities by use of their specific names as necessary.

300-year-old market in which individual and corporate underwriters known as "Names" underwrite insurance. The Corporation of Lloyd's, which is also known as the Society of Lloyd's, provides the building and personnel necessary to the market's administrative operations. The Corporation is run by the Council of Lloyd's, which promulgates "Byelaws," regulates the market, and generally controls Lloyd's administrative functions.

Lloyd's does not underwrite insurance; the Names do so by forming groups known as syndicates. Within each syndicate, participating Names underwrite for their own accounts and at their own risk. That is, as a matter of English law, Names' liability is several rather than joint, and individual Names are not responsible for the unfulfilled obligations of others. Each syndicate is managed and operated by a Managing Agent, who owes the Names a contractual duty to conduct the syndicate's affairs with reasonable care. Syndicates have no legal existence or identity apart from the Names they comprise.

Names must become members of Lloyd's in order to participate in the market. Prospective members are solicited and assisted in the process of joining by Member's Agents, whose duties to the Names are fiduciary in nature. Names must pass a means test to ensure their ability to meet their underwriting obligations, post security (typically, a letter of credit), and personally appear in London before a representative of the Council of Lloyd's to acknowledge their awareness of the various risks and requirements

3

of membership, and in particular the fact that underwriting in the Lloyd's market subjects them to unlimited personal liability.

Participation in the market also requires the execution of a number of contracts and agreements, the most important of which is the General Undertaking, the standardized contract between Lloyd's and the individual Names. Names additionally must enter into a Member's Agent's agreement, the contract that defines the relationship between the Name and his chosen Member's Agent, and one or more Managing Agent's agreements, which define the relationships between the Name and the Managing Agents of the syndicates he wishes to join. Under the present version of Lloyd's Byelaws, each of these agreements must contain clauses designating England as the forum in which disputes are to be resolved and choosing English law as the law governing such disputes.

Prior to 1986, the General Undertaking contained a provision requiring that disputes with agents or other Names be submitted to arbitration in London. Although this provision apparently did not cover disputes between Names and Lloyd's itself, it did require arbitration of claims against virtually any other entity, including anyone "not a party to any agreement with [the Name] referring such claims to arbitration." Following Parliament's passage of the Lloyd's Act of 1982, all Names, as a condition of continuing to be Names, were required to sign a new General Undertaking (the "1986 General Undertaking"), clause 2 of which replaced the arbitration provision with language that is the focus of this case:

4

2.1 The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England.

2.2 Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding (together in this Clause 2 referred to as "Proceedings") arising out of or relating to such matters shall be brought in such courts and, to this end, each party hereto irrevocably agrees to submit to the jurisdiction of the courts of England and irrevocably waives any objection which it may have now or hereafter to (a) any Proceedings being brought in any such court as is referred to in this Clause 2 and (b) any claim that any such Proceedings have been brought in an inconvenient forum and further irrevocably agrees that a judgment in any Proceedings brought in the English courts shall be conclusive and binding upon each party and may be enforced in the courts of any other jurisdiction.

2.3 The choice of law and jurisdiction referred to in this Clause 2 shall continue in full force and effect in respect of any dispute and/or controversy of whatsoever nature arising out of or relating to any of the matters referred to in this Undertaking notwithstanding that the Member ceases, for any reason, to be a Member of, or to underwrite insurance business at, Lloyd's.

Each of the plaintiffs in the appeals before us signed the 1986 General Undertaking and agreed to these forum selection/choice of law provisions, which we refer to as the "FS/COL clause."

Although underwriting at Lloyd's appears generally to have been a profitable endeavor up until the mid-1980's, at that time massive liability for pollution and asbestos-related injuries began

5

to change the situation somewhat.  According to the plaintiffs, when Lloyd's full-time members or "insiders" became aware of these risks, they concocted a sinister scheme to shift the liabilities onto unsuspecting American investors such as the plaintiffs.

In order to escape these liabilities, they claim, the insiders recruited new Names and steered them into syndicates, where they unwittingly underwrote high-risk asbestos reinsurance and toxic waste obligations, of which policies the insiders wanted no part. As a consequence of being placed in these syndicates, the plaintiffs allege, they have incurred large financial losses already and  remain liable for a great deal more.

The massive excess losses sustained by Names in the late 1980's and early 1990'sSSby Lloyd's estimate, something in the neighborhood of $22 billionSShave spawned a series of lawsuits throughout the United States.  The instant appeals are but the latest chapter in this litigation, a brief summary of which is instructive to the issues before us.  In *Hirsch v. Oakeley Vaughan Underwriting Ltd.*, No. 89-2563 (5th Cir. May 31, 1990) (unpublished), an American Name sued Lloyd's and his agents, claiming common law fraud.  We dismissed on the basis of f.n.c., finding the suit "aim[ed] at the heart of the unique self-regulatory mechanism within Lloyd's, which is a product of complex English legislation."  Slip op. at 7.

Various Names next brought suit in the Second, Seventh, and

6

Tenth Circuits, claiming that Lloyd's' above-described alleged conduct violated the federal securities laws. Lloyd's defended in part on the ground that the 1986 General Undertaking's FS/COL clauseSSthe clause at issue hereSSrequires all disputes to be litigated in England, to which the Names responded that the FS/COL clause constitutes an impermissible attempt to waive the protections of U.S. securities laws. The Second, Seventh, and Tenth Circuits rejected the Names' arguments, concluding that the securities laws' antiwaiver provisions did not bar dismissal of the suits.[2] A similar contention as to the antiwaiver provisions of the Ohio securities laws was later rejected by the Sixth Circuit.[3] More recently, the Fourth Circuit joined this chorus of authority in rejecting the claim that the federal securities statutes render the FS/COL clause void.[4] A number of courts also have rejected Names' attempts to avoid their contractual obligations by alleging that their agreement to the 1986 General Undertaking was procured by fraud, or that the FS/COL clause is unconscionable.[5]

---

[2] *See Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1366 (2d Cir. 1993); *Bonny v. Society of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 958 (10th Cir. 1992).

[3] *See Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227, 1229-32 (6th Cir. 1995).

[4] *See Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996), *mandamus denied sub nom. In re Allen*, 117 S. Ct. 2497 (1997).

[5] *See Bonny*, 3 F.3d at 160 n.10; *Riley*, 969 F.2d at 960; *Stamm v. Barclays Bank*, 960 F. Supp. 724, 730-33 (S.D.N.Y. 1997); *Tufts v. Corporation of Lloyd's*, No. 95-CIV-3480(JFK), 1996 WL 533639, at *5-*7 (S.D.N.Y. Sept. 19, 1996); *McDade v. NationsBank of Tex.*, No. H-94-3714, slip op. at 4-5 (S.D. Tex. June 26, 1995) (unpublished); *see also Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 210-11 (7th
(continued...)

7

Indeed, aside from one of the courts below in the instant case, only one court§§the Ninth Circuit§§has refused to enforce the FS/COL in a suit brought by Names against Lloyd's.[6] Not surprisingly, the plaintiffs rely heavily on *Richards* and urge us to adopt its conclusion that the antiwaiver provisions of the federal securities laws prevent the FS/COL clause from being enforced. *See id.* at 1426. Following the arguments that have been rejected by other courts, they also claim that Lloyd's procured their agreement to the General Undertaking, and, in particular, the FS/COL clause, by fraud and overreaching.

The first of the instant cases§§No. 96-20769 ("*Haynsworth*")§§is thus a suit by seventy-seven Names against Lloyd's claiming fraud, breach of fiduciary duty, violations of the Texas Deceptive Trade Practice-Consumer Protection Act (the "DTPA"), TEX. BUS. & COM. CODE ANN. § 17.41 *et seq.* (Vernon 1987 & Supp. 1997), and violations of the Securities Act (the "Texas Securities Act"), TEX. REV. CIV. STAT. ANN. art. 581-1 *et seq.* (Vernon 1964 & Supp. 1997). Shortly after *Haynsworth* was filed, Lloyd's moved to dismiss based on the General Undertaking's FS/COL clause, f.n.c., and, as to fifty-three of the plaintiffs who already had litigated or were then actively litigating their claims in the Second and Ninth Circuits,

(...continued)
Cir. 1993) (rejecting claim that the FS/COL clause should not be enforced because litigation in England would be so "gravely difficult and inconvenient as to deprive [plaintiffs] of their day in court.").

[6] *See Richards v. Lloyd's of London*, 107 F.3d 1422, 1424-30 (9th Cir. 1997).

8

collateral estoppel.   On July 17, 1996, the district court dismissed the case on the basis of the FS/COL clause and, in the alternative, f.n.c., and thirty-four of the plaintiffs now appeal that dismissal.[7]

The second caseSSNo. 96-20805 ("*Leslie*")SSarises from Charles Leslie's action against Lloyd's alleging violations of the federal securities laws (specifically, 15 U.S.C. § 78j(b) and rule 10b-5, 17 C.F.R. 240.10b-5), fraud, breach of fiduciary duty, and violations of the DTPA.  As in *Haynsworth*, Lloyd's moved to dismiss on the basis of the FS/COL clause and f.n.c.  The district court denied the motion but certified the questions presented by it for interlocutory appeal under 28 U.S.C. § 1292(b).

## II.

Although there previously was some uncertainty on this point, we recently have held that the enforceability of a forum selection clause is a question of law reviewable *de novo.*  *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997).  As the parties do not raise it, we therefore need not reach the considerably more enigmatic question of whether motions to dismiss on the basis of forum selection clauses are properly brought as motions under FED. R. CIV. P. 12(b)(1), 12(b)(3), or 12(b)(6), or 28

---

[7] Many of these plaintiffs-appellants were or still are litigants in suits against Lloyd's in the Second and Ninth Circuits.  Because we affirm the *Haynsworth* judgment of dismissal on the merits of the forum selection clause, however, we need not and do not reach any issues of collateral estoppel.

9

U.S.C. § 1406(a).[8]

Before considering the core issues, we must address whether federal or Texas law applies to the FS/COL clause enforceability determination. Federal jurisdiction in *Haynsworth* is based on diversity; jurisdiction in *Leslie* is based both on diversity and on the presence of a federal question. Both district courts relied on a combination of federal and Texas authorities in reaching their respective enforceability conclusions, although the *Leslie* court expressly recognized that federal law governs the question. Other courts that have considered the enforceability of the 1986 General Undertaking's FS/COL clause in similar situations have either pretermitted the choice of law issue or applied federal law without discussion.[9]

The *Leslie* court's conclusion on this issue was correct: Federal law applies to the FS/COL clause enforceability determination. In *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1

---

[8] *Compare, e.g., AVC Nederland B.V. v. Atrium Inv. Partnership*, 740 F.2d 148, 152-59 (2d Cir. 1984) (permitting rule 12(b)(1) motion) *with Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 909 & n.3 (5th Cir. 1993) (treating motion as one under rule 12(b)(3)) *and Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, S.p.A.*, 867 F.2d 697, 699-700 (D.C. Cir. 1989) (affirming dismissal under rule 12(b)(3)) *with Lambert v. Kysar*, 983 F.2d 1110, 1112 n.1 (1st Cir. 1993) (stating that rule 12(b)(6) is the appropriate vehicle) *with International Software Sys. v. Amplicon*, 77 F.3d 112, 114 (5th Cir. 1996) (analyzing as motion to dismiss under 28 U.S.C. § 1406(a)). *See also In re Fireman's Fund Ins. Cos.*, 588 F.2d 93, 94 (5th Cir. 1979) (approving order transferring venue pursuant to 28 U.S.C. § 1404(a)).

[9] *See Shell*, 55 F.3d at 1229 (declining to decide the issue on the ground that federal and Ohio law treat forum selection clauses similarly); *Richards*, 107 F.3d at 1426-29 (applying federal law); *Bonny*, 3 F.3d at 159-61 (same); *Hugel*, 999 F.2d at 209-11 (same); *Riley*, 969 F.2d at 956-58 (same); *Stamm*, 960 F. Supp. at 728-30 (same).

10

(1972), a decision we discuss in detail *infra*, the Court set forth a framework of enforceability standards to be applied by federal courts sitting in admiralty. *Id.* at 10-15. Just two years later, the Court implicitly extended *The Bremen*'s holding beyond the realm of admiralty by applying it to a claim brought under the federal securities laws. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 518-21 (1974). Following that cue, this court and others have not hesitated to apply these federal enforceability standards in non-admiralty cases.[10]

Whether *The Bremen*'s rules should be applied by federal courts sitting in diversity is a more difficult question, but fortunately one that this circuit recently has resolved. In *International Software Sys.*, 77 F.3d at 114-15, we held that *The Bremen*'s rules extend to dismissal determinations based on forum selection clauses in diversity cases, a holding that governs the case at bar. Because of this, the district courts *a quo* erred insofar as they applied Texas rather than federal law in their respective enforceability determinations. The proper law to apply to such questions is federal, whether jurisdiction be based on diversity, a federal question, or some combination of the two.[11]

---

[10] *See, e.g., Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795, 799 (5th Cir. 1990) (bankruptcy case); *AVC Nederland B.V. v. Atrium Inv. Partnership,* 740 F.2d 148, 156-60 (2d Cir. 1984) (federal securities fraud case); *In re Fireman's Fund Ins. Cos.*, 588 F.2d 93, 95 (5th Cir. 1979) (Miller Act).

[11] *Accord Jones v. Weibrecht*, 901 F.2d 17, 18-19 (2d Cir. 1990) (applying federal law to enforceability determination in diversity contract case); *Manetti-*
(continued...)

III.

A.

In *The Bremen*, 407 U.S. at 9, the Court, rejecting as a "parochial concept" the idea that "notwithstanding solemn contracts . . . all disputes must be resolved under our laws and in our courts," held that federal courts presumptively must enforce forum selection clauses in international transactions. Since *The Bremen*, the Court has consistently followed this rule and, in fact, has enforced every forum selection clause in an international contract that has come before it.[12]

Public policy weighs strongly in favor of *The Bremen*'s presumption, because uncertainty as to the forum for disputes and applicable law "will almost inevitably exist with respect to any contract touching two or more countries." *Scherk*, 417 U.S. at 516. That is, "[t]he elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting." *The Bremen*, 407 U.S. at 13-14. As we recently

---

(...continued)
*Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 512-13 (9th Cir. 1988) (same; diversity tort case); *Bryant Elec. Co. v. City of Fredericksburg*, 762 F.2d 1192, 1196-97 (4th Cir. 1985) (same; diversity contract case).

[12] *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, _ , 115 S. Ct. 2322, 2330 (1995); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 640 (1985); *Scherk*, 417 U.S. at 519-20.

stated in a case implicating these concerns, "[t]he Supreme Court has therefore instructed American courts to enforce [forum selection and choice of law] clauses in the interests of international comity and out of deference to the integrity and proficiency of foreign courts." *Mitsui*, 111 F.3d at 35 (citing *Mitsubishi*, 473 U.S. at 629).

The presumption of enforceability may be overcome, however, by a clear showing that the clause is "'unreasonable' under the circumstances." *The Bremen*, 407 U.S. at 10. Unreasonableness potentially exists where (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state. *Carnival Cruise Lines*, 499 U.S. at 595; *The Bremen*, 407 U.S. at 12-13, 15, 18. The party resisting enforcement on these grounds bears a "heavy burden of proof." *The Bremen*, 407 U.S. at 17.

The plaintiffs rest their arguments on the first and fourth of these exceptions. Specifically, they allege that the General Undertaking's FS/COL clause is unenforceable because of fraud and overreaching, and violates both federal and Texas public policy.

13

The *Haynsworth* district court rejected these arguments, enforced the clause pursuant to *The Bremen*'s presumption, and dismissed the suit.  The *Leslie* district court did the opposite, concluding that Leslie had established he was induced into agreeing to the clause through fraud and overreaching and that the clause violates both United States and Texas public policy.

B.

Fraud and overreaching must be specific to a forum selection clause in order to invalidate it.  That is, *The Bremen*'s exception for unreasonable fraud or overreaching

> does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud . . . the clause is unenforceable.  Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion.

*Scherk*, 417 U.S. at 519 n.14 (emphasis in original) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)).  Thus, allegations of such conduct as to the contract as a wholeSSor portions of it other than the FS/COL clauseSSare insufficient; the claims of fraud or overreaching must be aimed straight at the FS/COL clause in order to succeed.[13]

The plaintiffs protest that *Prima Paint* dealt exclusively with

---

[13] *See, e.g., Prima Paint*, 388 U.S. at 403-04; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 637 F.2d 391, 398 & n.11 (5th Cir. Unit B Feb. 1981) (holding that to render arbitration clause unenforceable, coercion and duress must relate specifically to the clause rather than to the contract as a whole).

14

arbitration clauses under the United States Arbitration Act and that there is no authority for the proposition that the above rule applies to forum selection or choice-of-law clauses as well. This flatly contradicts the language of *Scherk*, which at a minimum extended the rule of *Prima Paint* to forum selection clauses in general. *See Scherk*, 417 U.S. at 519 n.14. Moreover, *Scherk* and later courts have noted that "foreign arbitration clauses are but a subset of foreign forum selection clauses in general." *Vimar Seguros*, 115 S. Ct. at 2326 (citing *Scherk*, 417 U.S. at 519).

In *Mitsui*, we rebuffed a similar attempt to distinguish between arbitration and forum selection/choice-of-law clauses for enforceability purposes, noting that even on the *Vimar Seguros*'s dissent's view, "in relevant aspects, there is little difference between the two." *Mitsui*, 111 F.3d at 36 (quoting *Vimar Seguros*, 515 U.S. at _____ n.7, 115 S. Ct. at 2333 n.7 (Stevens, J., dissenting)). The proposed distinction contradicts both Supreme Court and Fifth Circuit precedent and consequently must be rejected.

It follows that, to the extent the plaintiffs claim fraud and overreaching in aspects of the General Undertaking other than the FS/COL clause, their allegations are irrelevant to enforceability. As Lloyd's points out, many of the plaintiffs' claims of fraud and overreaching fall squarely into this category. Though we need not detail them all, by way of example these include the contention

15

that Lloyd's failed adequately to disclose the effect of the Lloyd's Act of 1982, the assertion that Lloyd's disclosed critical risks only after the plaintiffs had been induced into signing the General Undertaking, and the claim that Lloyd's conditioned the Names' continued membership on signing the version of the General Undertaking that contained the FS/COL clause. While these allegations, if proved, might very well be relevant to the merits of the claims in the absence of a forum selection clause, they are wholly inapposite to our enforceability determination, which must of course precede any analysis of the merits. *See Smith Barney Shearson, Inc. v. Boone*, 47 F.3d 750, 752 (5th Cir. 1995).

The plaintiffs argue that, because the FS/COL clause was the primary difference between the 1986 General Undertaking and previous agreements, their evidence of fraud regarding the General Undertaking as a whole is actually evidence as to the FS/COL clause specifically. We note initially that the FS/COL clause is not the only difference between the 1986 and pre-1986 General Undertakings; the 1986 version added a provision by which the Names agreed to abide by the dictates of, and Byelaws promulgated under, the Lloyd's Act of 1982, which substantially altered the regulatory regime in which Lloyd's operates. The 1986 General Undertaking also, for the first time, required Names to obey "any direction given or provision or requirement made or imposed by the Council," which at the time was a relatively new entity created by the

16

Lloyd's Act of 1982.

Moreover, the inclusion of the FS/COL clause was not the radical change that plaintiffs claim it to be, as the previous version of the General Undertaking had contained an arbitration clause requiring that disputes with other Names or agents be arbitrated in London. Although the FS/COL clause in the 1986 General Undertaking is greater in scope, we have already noted that such arbitration clauses are merely a specialized subset of the larger group of forum selection clauses. In short, the pre- and post-1986 General Undertakings are sufficiently different that the 1986 version cannot be said merely to have added the FS/COL clause. The allegations that go to fraud or overreaching in the General Undertaking as a whole are just that: allegations that go to the General Undertaking as a whole. *Scherk* and *Prima Paint* render them inapposite.

Precious little remains of the plaintiffs' contentions after they run the gamut of this requirement. If any argument as to fraud plausibly survives, it is that Lloyd's failed adequately to disclose the effects of the FS/COL clause when it presented the plaintiffs with the version of the General Undertaking that included it. According to the plaintiffs, they were fraudulently induced to sign the 1986 General Undertaking in reliance on assurances by Lloyd's[14] that the new agreement contained "few

_____

[14] In fact, the assurances were by various Member's Agents allegedly acting
(continued...)

17

variations of substance" from the old.[15]  This, they claim, was a

fraudulent omission specifically as to the FS/COL, because nothing

in Lloyd's description of these changes mentioned it.

 We find this argument unpersuasive.  In *Bhatia v. Johnston*,

818 F.2d 418 (5th Cir. 1987), a plaintiff attempted to avoid an

arbitration clause in a brokerage agreement by claiming he had been

told the clause was "the same as" that in his previous contract.

*Id.* at 422 n.5.  Applying *Prima Paint*, we held that whatever

misrepresentations might have been made were "related to the

entirety" of the new agreement and therefore were insufficient to

block enforcement of the clause.  *Id.* at 422.  The plaintiffs'

argument is at best no different from Bhatia's, and is more likely

quite a bit weaker insofar as they were at least alerted to the

existence of some "variations."  Our holding in *Bhatia* compels the

conclusion that their claims go to the 1986 General Undertaking as

a whole and that they therefore cannot bar enforcement of the

FS/COL clause.

 Alternatively, the fraud claim fails, even if plaintiffs'

contentions somehow survive *Prima Paint*.  The FS/COL clause was

---

(...continued)
at Lloyd's direction.

 [15] Lloyd's claims that, to the extent these assurances were made, they referred to the agreements between the Names and their respective Members' Agents rather than to the 1986 General Undertaking.  Although the record appears to support Lloyd's on this point, we need not resolve this highly fact-specific dispute, for, as discussed *infra*, the FS/COL clause is enforceable in any case.  For the limited purposes of this discussion, we therefore adopt *arguendo* the *Leslie* district court's finding that the statements referred to the 1986 General Undertaking.

straightforward and was a prominent part of the one-and-one-half-page General Undertaking, and the plaintiffs are presumed to have known what it said.[16] The plaintiffs were sophisticated parties contracting voluntarily; it is not for us to impose a duty upon one party to counsel the other as to the risks and benefits of a contract. Indeed, as Lloyd's points out, there was nothing to explain. The duty was the plaintiffs' to read the plain terms of the agreement, not Lloyd's to lecture them about it.

These conclusions effectively dispose of the plaintiffs' claims of overreaching, as well. In essence, they argue that Lloyd's engaged in overreaching by forcing the Names to choose between signing a contract with the FS/COL clause and terminating their membership as Names. The *Leslie* district court agreed, reasoning that Lloyd's "take-it-or-leave-it offer" unfairly deprived Leslie of "the option of rejecting with impunity."

We emphatically disagree. Although there is some ambiguity as to the precise boundaries of what constitutes "overreaching," a nebulous concept at best,[17] we can state with certainty that none occurred here. As Lloyd's points out, the argument that the 1986

---

[16] *E.g., In re Cajun Elec. Power Coop.*, 791 F.2d 353, 359 ("'A person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand it.'") (quoting *Smith v. Leger*, 439 So. 2d 1203, 1206 (La. App. 1st Cir. 1983)); *Bonny*, 3 F.3d at 160 n.10; *St. Petersburg Bank & Trust Co. v. Boutin*, 445 F.2d 1028, 1032 (5th Cir. 1971).

[17] "Overreaching" is "that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." BLACK'S LAW DICTIONARY 1104 (6th ed. 1990).

General Undertaking constituted a "take-it-or-leave-it offer" goes to the contract as a whole and therefore cannot overcome the FS/COL clause under *Prima Paint*. As we recently stated in the context of an arbitration clause in an employment contract, the claim that an agreement "is an unconscionable contract of adhesion is an attack on the formation of the contract generally, not an attack on the arbitration clause itself." *Rojas v. TK Communications, Inc.*, 87 F.3d 745, 749 (5th Cir. 1996).

Even were we not to apply *Prima Paint*, *Carnival Cruise Lines* would compel us to reject this argument on the merits. There, the Court enforced a forum selection clause against an unsophisticated cruise ship passenger, notwithstanding the disparity in the parties' bargaining power and the fact that the contract had not been subject to negotiation. 499 U.S. at 593-95. Aside from the fact that Haynsworth, Leslie, and the other plaintiffs are considerably more sophisticated than was the passenger in *Carnival Cruise Lines*, we find nothing of substance to distinguish that case from the case at bar. Indeed, a careful examination of the evidence underlying the plaintiffs' claims reveals that the 1986 General Undertaking was an agreement considerably more equitable than the one at issue there. *Carnival Cruise Lines* thus compels us to hold the plaintiffs to their respective contracts, including the

20

FS/COL clause to which they duly agreed.[18]

C.

The plaintiffs also contend that the General Undertaking's FS/COL clause is "unreasonable" because it contravenes public policy as embodied in the antiwaiver provisions of federal securities law, Texas securities law, and the Texas DTPA. The *Leslie* district court agreed with this argument; the *Haynsworth* district court did not. Although we are unable to identify any decision specifically addressing the FS/COL clause as regards the antiwaiver provisions of the Texas laws, five of our sister circuits have previously rejected this argument as to the federal statutes.[19] Besides the district court in *Leslie*, the only court that has ever refused to enforce the General Undertaking's FS/COL clause on these grounds is the Ninth Circuit. *See Richards*, 107 F.3d at 1426-28.

The antiwaiver provisions are straightforward. Section 14 of the Securities Act of 1933 provides: "Any condition, stipulation, or provision binding any person acquiring any security to waive

---

[18] *Accord Kevlin Serv., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995) (holding that *The Bremen*'s presumption of enforceability applies to forum selection clauses in form contracts); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154-55 (5th Cir. 1992) (holding that adhesion contracts requiring arbitration of securities disputes are not unconscionable as a matter of law).

[19] *See Allen,* 94 F.3d at 928-30; *Shell,* 55 F.3d at 1229-32; *Bonny*, 3 F.3d at 160-62; *Roby*, 996 F.2d at 1363-66; *Riley,* 969 F.2d at 957-58.

21

compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." 15 U.S.C. § 77n. Section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(a), and the antiwaiver provision of the Texas Securities Act, TEX. REV. CIV. STAT. ANN. art. 581-33L (Vernon Supp. 1997), are substantively identical for purposes of the issue before us. Similarly, the antiwaiver provision of the DTPA provides generally that "[a]ny waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void." DTPA § 17.42(a), TEX. BUS. & COM. CODE ANN. § 17.42(a) (Vernon Supp. 1997).

As a threshold matter, Lloyd's argues that nothing Names acquire in the course of their relationship with Lloyd's constitutes a "security" within the meaning of federal and Texas securities laws and that the plaintiffs are not "consumers" who have acquired "services" within the meaning of the DTPA. *See* DTPA § 17.45, TEX. BUS. & COM. CODE ANN. § 17.45 (Vernon 1987) (defining "consumer" and "services"). The Supreme Court confronted similar arguments in *Scherk*, ultimately affirming a dismissal without addressing the question of whether the plaintiffs had acquired securities. *Scherk*, 417 U.S. at 514 n.8. Because, as the Supreme Court did in *Scherk*, we ultimately find the forum selection clause enforceable, we follow the same route here and express no view on the merits of these arguments.

22

As with the fraud and overreaching claims, the basic framework for analyzing the plaintiffs' Texas and federal public policy arguments is the strong presumption of enforceability established by *The Bremen* and *Scherk*, and the highest hurdle they must overcome to demonstrate "unreasonableness" is *Scherk*.  There, the plaintiff alleged violations of § 10(b) of the Exchange Act and attempted to resist enforcement of an arbitration clause on the basis of the act's antiwaiver provision, one of the statutes invoked here. Applying *The Bremen*, the Court rejected this argument and along with it the view that

> only United States laws and United States courts should determine this controversy in the face of a solemn agreement between the parties that such controversies be resolved elsewhere. . . . To determine that "American standards of fairness" . . . must nonetheless govern the controversy demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries.

*Scherk*, 417 U.S. at 517 n.11.  The Court went on to reiterate *The Bremen*'s rejection of the "parochial" notion that all disputes in international business transactions "must be resolved under our laws and in our courts," reasoning that "[w]e cannot have trade and commerce in world markets . . . exclusively on our terms, governed by our laws and resolved in our courts."  *Id.* at 519 (quoting *The Bremen*, 407 U.S. at 9).

More generally, we must tread cautiously before expanding the operation of U.S. securities law in the international arena.  The regulatory regime Congress has constructed is "designed to protect

23

American investors and markets," not to stamp out "any fraud that somehow touches the United States." *Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 906 (5th Cir. 1997). To insist on the application of American securities law where the laws of the parties' agreed-upon forum meet this concern would be the very height of the parochialism that *The Bremen* condemned. *See The Bremen*, 407 U.S. at 9.

This is particularly so in the case of England, a forum that American courts repeatedly have recognized to be fair and impartial.[20] We have not hesitated to force plaintiffs to litigate their claims of securities fraud in that nation, differences between English and American remedies notwithstanding.[21]

Beginning with the presumption that the FS/COL clause is binding, and recognizing the plaintiffs' "heavy burden of proof" to overcome this, *The Bremen*, 407 U.S. at 17, we thus proceed to consider the plaintiffs' arguments against enforcement of the clause. They initially attempt to distinguish *Scherk* on the ground that the Names' transactions with Lloyd's were not "international business transactions."

The most charitable adjective with which to describe this argument is "disingenuous." Each of the American plaintiffs signed

---

[20] *See, e.g., id.* at 12; *Riley*, 969 F.2d at 958; *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 829 (5th Cir. 1986).

[21] *See Robinson*, 117 F.3d at 907-09 (affirming referral of securities fraud claims to England on ground of f.n.c.).

a series of agreements with English entities and traveled to England as part of the process of becoming a Name. We need not dwell on this contention any further, it being sufficiently obvious that an agreement is "international" when it involves an American Name's underwriting international insurance policies in an English market, pooling resources with other Names from over eighty countries, and all the while explicitly agreeing to be bound by English law.

The plaintiffs also aver that *Scherk* and the Supreme Court's other forum selection cases are distinguishable in that they dealt with forum selection clauses unaccompanied by choice-of-law clauses. The claimed significance of this is that a forum selection clause, in isolation, acts only to deprive the aggrieved party of a "procedural right" to a particular forum, whereas a forum selection clause in combination with a choice-of-law clause impermissibly extinguishes both a "procedural right" and a more important "substantive right" to the remedies afforded by a particular statute or common-law cause of action. The Ninth Circuit placed substantial weight on this distinction, ultimately concluding that the FS/COL clause "require[s] the waiver of substantive provisions of the 1933 and 1934 Acts and [is] consequently void." *Richards*, 107 F.3d at 1428.

Plaintiffs are at least partially wrong in their premise, for *Scherk* involved a foreign forum selection clause accompanied by a

25

choice-of-law clause selecting the law of Illinois. *Scherk*, 417 U.S. at 508. Presumably, this meant that the parties could rely on the protections of the federal securities laws as well, but the decision did not rest on this assumption. Instead, the Court roundly rejected the notion that a forum selection clause can be circumvented by a party's asserting the unavailability of American remedies. *See id.* at 517-19.

The *Scherk* Court's failure to draw the distinction the plaintiffs urge seems eminently sensible to us, for surely it is obvious that, even in the absence of a choice-of-law clause, enforcement of a foreign forum selection clause frequently will result in the application of foreign law to the dispute. *See Scherk*, 417 U.S. at 519 n.13. Choice of law is often one of the reasons for obtaining a forum selection clause. *The Bremen*, 407 U.S. at 13-14 n.15.

It cannot be the case that, by virtue of a foreign forum selection clause standing alone, the domestic party to an international business agreement retains a "substantive right" to assert the remedies and protections of American statutes in the contractually agreed-upon forum. The sophisticated individuals entering into these agreements are hardly so naïve as to believe that by choosing only a foreign forum and not the law to be applied therein, they thereby retain some inalienable privilege of litigating their disputes under American law.

It is unrealistic to expect a foreign tribunal even to entertain this notion, when faced with parties that have selected the tribunal as their forum. There is nothing talismanic about American law, and certainly nothing that compels foreign courts to "exalt [its] primacy" merely because it provides remedies that their laws do not. *Scherk,* 417 U.S. at 517 n.11.

The plaintiffs protest that *Mitsubishi* and *Vimar Seguros* support their theory about combination forum selection/choice-of-law clauses extinguishing substantive rights. It is a strained reading of these decisions that they urge on us, however.

In *Mitsubishi*, 473 U.S. at 640, the Court ordered Japanese arbitration of an American automobile dealer's antitrust claims against its franchisor, notwithstanding that the foreign arbitrator might misapply U.S. law. The key to the decision was the same driving force that was behind *The Bremen* and *Scherk*: "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes . . . ." *Id.* at 629 (citing *Scherk*, 417 U.S. 506). Nonetheless, in *dictum*, the Court stated that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."

27

*Id.* at 637 n.19. Pointing to this statement, the plaintiffs urge the same conclusion the Ninth Circuit reached in *Richards*, 107 F.3d at 1427, i.e., that the General Undertaking's FS/COL clause should be condemned here.

We do not read *Mitsubishi* so broadly. Setting aside the fact that it is *dictum*, the quoted statement, by its own terms, is limited to the antitrust context, as is *Mitsubishi* more generally.

This circuit expressly has recognized that "'the antitrust laws of the United States embody a specific congressional purpose to encourage the bringing of private claims in the American courts in order that the national policy against monopoly may be vindicated.'"[22] Indeed, it is precisely this "crucial point of difference" between antitrust suits and other types of actions, *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 829-30 (5th Cir. 1993), that led us to prohibit *f.n.c.* dismissals in antitrust cases while allowing them in others.[23] Properly read in conjunction with *Scherk*SSa case in which the antiwaiver provisions of the federal securities laws were directly before the CourtSSthis single sentence from *Mitsubishi* cannot be given the sweeping implications

---

[22] *Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1142-43 (5th Cir. 1989) (quoting *Laker Airways Ltd. v. Pan American World Airways*, 568 F. Supp. 811, 818 (D.D.C. 1983)).

[23] *See Industrial Inv. Dev. Corp. v. Mitsui & Co.*, 671 F.2d 876, 890-91 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007 (1983).

that the plaintiffs and the Ninth Circuit attribute to it.[24]

*Vimar Seguros*, a case involving the enforceability of forum selection and choice of law clauses under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1300 *et seq.*, is similarly inapposite. Quoting *Mitsubishi*, the Court there expressed concern that the combination of a forum selection clause and a choice of law clause might deprive the parties of their rights under COGSA, a uniform system of international rules governing carrier and shipper liability. *Vimar Seguros*, 515 U.S. at ___, 115 S. Ct. at 2330 (quoting *Mitsubishi*, 473 U.S. at 637 n.19).

But COGSA, unlike the American securities statutes or the Texas laws, is "the culmination of a multilateral effort" to establish such rules, an international scheme the very nature of which would be frustrated by permitting parties to opt out of it. *Id.*, 515 U.S. at ___, 115 S. Ct. at 2328. Because the enforceability doctrine of *The Bremen* and *Scherk* is grounded in the special needs of parties contracting in international commerce, it would make little sense to apply it against a statute specifically designed to foster uniformity in international shipping agreements. *Id.* As the Second Circuit has recognized, application of the usual enforceability rules to COGSA would create an exception that "would

---

[24] *Accord Shell*, 55 F.3d at 1230-31; *Bonny*, 3 F.3d at 159-61; *Roby*, 996 F.2d at 1364 & n.3; *Riley*, 969 F.2d at 956-57.

29

swallow the whole." *AVC Nederland*, 740 F.2d at 160.[25]

Our judgment is also informed by the fact that the Supreme Court has never overruled, or indeed even expressly limited, either *The Bremen* or *Scherk*. Quite simply, *Scherk* rejected the idea that the antiwaiver provisions of U.S. securities laws bar enforcement of forum selection clauses in international transactions. As *Scherk* is directly on point, we are bound to follow it, regardless of whether we believe (or, as the case may be, do not believe) that later decisions have undermined its rationale.[26]

Haynsworth and Leslie's remaining objections to the enforcement of the FS/COL clause essentially echo the Ninth Circuit's view: "The available English remedies are not adequate substitutes for the firm shields and finely honed swords provided by American securities law." *Richards*, 107 F.3d at 1430. The American system of securities regulation may be the broadest, most comprehensive of all. We refuse to accept the notion, however, that the sheer scope of U.S. securities law automatically renders that of other countries inferior or should provide American investors a means to escape their contractual obligations when they begin to prove too costly.

The view that every foreign forum's remedies must duplicate

---

[25] *Accord Mitsui*, 111 F.3d at 34 (enforcing combination forum selection clause/choice of law clause choosing COGSA as the applicable law).

[26] *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

30

those available under American law would render all forum selection clauses worthless and would severely hinder Americans' ability to participate in international commerce.  We wholeheartedly adopt the Second Circuit's response to the plaintiffs' contention:

> It defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement.  A plaintiff simply would have to allege violations of *his country's* tort law or *his country's* statutory law or *his country's* property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction.  We refuse to allow a party's solemn promise to be defeated by artful pleading.

*Roby*, 996 F.2d at 1360 (emphasis in original).[27]

Careful weighing of these considerations leads us to join the majority of courts that have considered this issue in concluding that the antiwaiver provisions of U.S. securities laws do not bar enforcement of the FS/COL clause.  The same reasoning compels an identical conclusion as to the antiwaiver provisions of the Texas Securities Act and the DTPA.

As other courts have observed, English law provides a variety of protections for fraud and misrepresentations in securities transactions.[28]  As the *Allen* court recognized, for example, English law permits Names to bring "claims based on the tort of deceit,

---

[27] *See also Robinson*, 117 F.3d at 909 (holding that the substantially greater scope of discovery under American law does not bar transfer to England on ground of f.n.c.).

[28] *See Allen*, 94 F.3d at 929; *Shell*, 55 F.3d at 1231; *Bonny*, 3 F.3d at 161; *Roby*, 996 F.2d at 1365; *Riley*, 969 F.2d at 958.

breach of contract, negligence, and breach of fiduciary duty," with possible "injunctive, declaratory, recissionary, and restitutionary relief."  94 F.3d at 929 (citing *Shell*, 55 F.2d at 1230-31).

Indeed, in some respects English law appears to provide even greater protections than does U.S. law.  *See Roby*, 996 F.2d at 1365 (noting the "low scienter requirements" of English misrepresentation law).  The plaintiffs' remedies in England are adequate to protect their interests and the policies behind the statutes at issue.

Having previously enjoyed the benefits of Lloyd's contractual obligations to them, the plaintiffs must now live up to theirs as well.  The FS/COL must be enforced, and the plaintiffs as "'representative[s] of the American business community'" required to "'honor [their] bargains.'"  *Mitsubishi*, 473 U.S. at 640 (quoting *Alberto-Culver Co. v. Scherk*, 484 F.2d 611, 620 (7th Cir. 1973) (Stevens, J., dissenting), *rev'd*, 417 U.S. 506 (1974)).  Because the *Leslie* district court found otherwise, its judgment is reversed and remanded with instructions to dismiss.  The *Haynsworth* district court's judgment of enforceability is affirmed.


IV.

Finally, the *Haynsworth* plaintiffs claim that the district court erred in dismissing their claims without permitting additional discovery and conducting an evidentiary hearing on the

32

issue of whether the FS/COL clause had been procured by fraud. We find little merit in the discovery claim, particularly given their halfhearted response to the district court's invitation to submit "anything they wanted the court to consider." In large part, the *Haynsworth* plaintiffs appear to have relied on the record in *Leslie*, a great deal of which has no direct relevance to their claims.

A party seeking a continuance to conduct discovery must demonstrate "both why it is currently unable to present evidence creating a genuine issue of fact and how a continuance would enable the party to present such evidence." *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48 F.3d 927, 930 (5th Cir. 1995). A refusal to grant such a continuance is reviewable for abuse of discretion only. *Id.* A careful review of the record persuades us that this standard has not been met, so we find no error.

The plaintiffs fare no better on their claim that *Moseley v. Electronic & Missile Facilities*, 374 U.S. 167 (1963), required the district court to conduct an evidentiary hearing. In *Moseley*, the party resisting enforcement of an arbitration clause attacked not only the overall agreement but also the arbitration clause specifically, claiming that it had been procured by fraud. *Id.* at 169. The Court, noting that the allegation of fraud went straight to the arbitration clause itself, held that that issue must first be adjudicated at "trial" before the clause could be enforced. *Id.*

33

at 171.  This is entirely consistent, of course, with *Prima Paint* and *Scherk*'s requirement that fraud must go specifically to a forum selection or arbitration clause in order to bar enforcement.

Here, as in *Moseley*, the plaintiffs claim fraud in the inducement of the FS/COL clause.  As we have explained, however, nothing in their more specific allegations supports this claim.  At best, what fraud they allege goes only to the 1986 General Undertaking as a whole.  Even reading *Moseley* literally, to require a "trial" rather than simply a summary judgment or other proceeding in which the parties are permitted to submit evidenceSSan interpretation the validity of which we need not and do not reachSSthe plaintiffs have not met the threshold requirement that their claims go specifically to the clause.  The district court properly declined to hold an evidentiary hearing.

V.

Because we find the FS/COL clause of the 1986 General Undertaking enforceable, we need not consider whether the suits should also be dismissed on the ground of f.n.c.  For the reasons stated above, we AFFIRM the judgment of dismissal in No. 96-20769 and REVERSE and RENDER a judgment of dismissal in No. 96-20805.

34