**REVISED, July 14, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**
_____

No. 97-21048
_____


AFRAM CARRIERS, INC., et al.,

                                        Plaintiffs,

AFRAM CARRIERS, INC.,

                                        Plaintiff-Appellee,

VERSUS

BRUCE MOEYKENS, et al.,

                                        Defendants,

ADELE NAJAR VDA. DE PANTA,
Individually and as Personal Representative of
the Estate of Augustin Pantin Pazos;

EDGAR PANTA NAJAR,

ROSA DEL CARMEN PANTA NAJAR,

and

ELVIS ANDERSON PANTA NAJAR,

                                        Movants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
June 26, 1998


Before KING, SMITH, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This appeal addresses the propriety of a choice of forum clause in a settlement agreement related to a Limitation Act proceeding, 46 U.S.C. § 181 *et seq*. Finding no reversible error, we affirm.

## I.

The S/S TAMPA BAY, a ship owned and operated by Afram Carriers, arrived in the Peruvian port of El Callao, and four employees of the contractual security service, Servipro, hired to guard the ship boarded. Among the four was the deceased, Augustin Panta.

Peruvian port authorities ordered Afram to fumigate the ship. Afram evacuated all crew members except the captain, the chief engineer, and the four Servipro employees. The ship's captain assigned the security personnel to quarters on the ship during the fumigation. While there, Panta, the chief engineer, and several others still aboard were overcome by fumes from the chemical, methyl bromide, used for fumigation. Panta later died from inhalation of this toxic substance.

Afram and Panta's wife and children entered into a settlement agreement providing that, in exchange for a sum of about U.S. $2000, the Pantas release all existing claims against Afram in both the Peruvian and American courts. The agreement further provides Peruvian choice of law and forum-selection clauses.[1]

---

[1] Specifically, the settlement agreement states:

(continued...)

2

At about the time that Afram was settling the Panta heirs' wrongful death claim, it instituted a limitation of liability proceeding under the Limitation Act, 46 U.S.C. § 181 *et seq.*, in federal court and included all personal injury and property damage claimants in its complaint. The district court ordered that monitions be served against all potential claimants in order to give them notice that they needed to present, or forever waive, their rights.

Because of the settlement agreement, Afram did not serve the Panta claimants with a monition. Eighteen months later, however, when they found out about the limitation proceeding, the Pantas moved to intervene and attempted to assert their wrongful death claim against Afram and the TAMPA BAY.

Afram resisted the intervention on the ground that the settlement agreement provided that any disputes arising over the release would be litigated in Peruvian, rather than American, courts. The district court tentatively agreed to enforce the forum-selection clause but allowed the parties to submit additional briefing on the "possible effects that enforcing the forum selection provision would have on the Panta claimants."

After reviewing the additional briefing, the court denied the motion to intervene and dismissed the claims without prejudice if the claimants filed an appropriate action in the Peruvian courts

(...continued)
This Agreement shall be interpreted, governed by, and construed in accordance with the laws of the Republic of Peru and any issue arising out of this Agreement will be subject to the exclusive jurisdiction of the Peruvian courts applying Peruvian law.

within thirty days.  The Pantas appeal the denial of their motion to intervene.[2]

## II.

"[T]he enforceability of a forum-selection or arbitration clause is a question of law which is reviewed de novo." *Mitsui & Co. (USA), Inc. v. MIRA M/V*, 111 F.3d 33, 35 (5th Cir. 1997) (per curiam) (citations omitted).  Forum-selection clauses are presumptively valid:  "[A] freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power . . . should be given full effect." *M/S BREMAN v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972).  "The burden of proving unreasonableness is a heavy one, carried only by a showing that *the clause* results from fraud or overreaching, that it violates a strong public policy, or that enforcement of the clause deprives the plaintiff of his day in court." *Mitsui*, 111 F.3d at 35 (emphasis added) (citing *THE BREMAN*, 407 U.S. at 12-13, 15, 18).  Allegations that the entire contract was procured as the result of fraud or overreaching are "inapposite to our [forum-selection clause] enforceability determination, which must . . . precede any

---

[2] The Pantas' motion to intervene sought an "intervention of right" under FED. R. CIV. P. 24(a) because (1) the claim related to the res at issue in the Limitation Act proceeding and because the intervenors had an interest in the res; (2) a denial of intervention would impede their claim to the res; and (3) their rights would not be adequately represented by the other parties in the proceeding (who would be competing for their own shares of the res at the intervenors' expense).  *See* 6 JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 24.03[1] (3d ed. 1998) (outlining the three requirements to satisfy rule 24(a)).  Denials of motions to intervene of right are final orders under 28 U.S.C. § 1291. Accordingly, we have appellate jurisdiction. *See Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 524-25 (1947).

4

analysis of the merits [of the contract's validity]." *Haynsworth v. The Corporation*, 121 F.3d 956, 964 (5th Cir. 1997) (citation omitted), *cert. denied*, 118 S. Ct. 1513 (1998).

The intervenors attempt to overcome the presumption of the forum-selection clause's validity by arguing that (1) Afram procured the clause through fraud and overreaching (including mistake); (2) the clause violates a strong public policy of the United States; (3) Afram should be estopped from asserting its rights under the clause because it took other, inconsistent positions in this litigation; (4) enforcement of the clause would prevent the intervenors from having their day in court; and (5) the release does not cover the dispute at issue.

A.

The Pantas primarily argue that Afram procured the forum-selection clause through fraud and overreaching. The facts, at least as the Pantas tell the story, are certainly dire. The deceased was the primary breadwinner for his family. He had no life insurance and, by all accounts, his family was financially and emotionally devastated by his death.

In the weeks after the death, the family was offered (although from the record it is unclear who first solicited the offer), and accepted, a cash settlement from Afram. In exchange for about one year's salary, U.S. $2000, the family agreed to waive all claims against Afram in both the Peruvian and U.S. courts. The Pantas further agreed to litigate all disputes concerning the release

5

under Peruvian law and in Peruvian courts.

The Pantas use the facts to facilitate the natural inference that the settlement was procured through fraud or duress or was otherwise unconscionable. From there, we naturally are inclined to make a second inference: The forum-selection clause, as part of the illegally obtained contract, must also have been illegally procured.

This chain of inferences, however, is foreclosed not only by binding circuit precedent, *see, e.g.*, *Haynsworth*, 121 F.3d at 964; *Mitsui*, 111 F.3d at 35, but also by the policies underlying the presumption in favor of enforcing such clauses. "The Supreme Court has . . . instructed American courts to enforce [forum-selection] clauses in the interests of international comity and out of deference to the integrity and proficiency of foreign courts." *Mitsui*, 111 F.3d at 35 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629 (1985)). Were we to judge the soundness of the forum-selection clause by what we believe to be the merits of the underlying contract, we would subvert the aforementioned comity concerns by making a merits inquiry that the Supreme Court has determined is best left to the forum selected by the parties.

Only when we can discern that *the clause itself* was obtained in contravention of the law will the federal courts disregard it and proceed to judge the merits. Because, in this case, we can draw an inference of an illegally obtained forum-selection clause only if we judge the merits of the contractSSthat is, the movants

have offered no evidence[3] that the clause itself was obtained as a result of fraud or overreachingSSwe cannot disregard it on that ground.[4]

## B.

The Pantas also argue that enforcing the forum-selection clause would thwart the "equitable resolution" goal of the Limitation Act. That is, "[t]he purpose of limitation proceedings is . . ., in an equitable fashion, to provide a marshalling of assetsSSthe distribution pro rata of an inadequate fund among claimants, none of whom can be paid in full." *Petition of Tex. Co.*, 213 F.2d 479, 482 (2d Cir. 1954) (internal quotation and citation omitted).

A forum-selection clause is potentially unreasonable when it would undermine a "strong public policy" of the forum. *Mitsui*, 111 F.3d at 35. Initially, we must determine, therefore, whether the equitable resolution afforded by the Limitation Act is a "strong" public policy that justifies overcoming the forum-

---

[3] The Pantas argue that they have offered evidence that the forum-selection clause was obtained through fraud: (1) Afram told the Pantas that they could not sue the ship because the shipowner was American; (2) Afram failed to notify the Pantas of this proceeding; and (3) the Pantas would have filed claims in this limitation proceeding, but for the misrepresentations and failures to disclose. This evidence, however, logically goes to the validity of whole settlement agreement rather than to the forum-selection clause:  It explains why the Pantas would not have wanted to settle their claims at all, *not* why they would not have agreed to the presence of a forum-selection clause.  Therefore, although "the plaintiffs claim fraud in the inducement of the [forum-selection] clause[,] . . . nothing in their more specific allegations supports this claim." *Haynsworth*, 121 F.3d at 970.

[4] For the same reasons, the Pantas' claim of mistake falters:  They fail to offer any evidence that the clause itself, rather than the entire settlement agreement, was the result of some contract-excusing mistake.

7

selection clause.

The answer is not simple. Admittedly, equitable resolution of claims from a limited fund is one of the policies behind Limitation Act proceedings. *See Texas Co.*, 213 F.2d at 482. Another consideration, however, is promoting settlement and subsidizing shipbuilders.[5] In fact, most courts have held that the main force driving Congress to enact the Limitation Act was to put American shipbuilders on a competitive footing with their European counterparts by limiting their liability to the value of the ship and her cargo.[6] Because of this fundamental consideration, courts generally have construed ambiguities in the Act in favor of shipowners. *See, e.g.*, *Coryell v. Phipps*, 317 U.S. 406, 411 (1943).

In this case, the two policies of the statute would appear at loggerheads. On the one hand, the goal of subsidizing shipowners and promoting settlement supports shipowners' ability to use and disregard the Limitation Act proceedings as best suits their interests in settling the claims against them promptly. At the outset, the shipowner was not obliged to invoke the proceeding against all claimants. Had it decided not to invoke the shield,

---

[5] *See, e.g.*, *British Transp. Comm'n v. United States*, 354 U.S. 129, 133 (1957) ("The real object of the act . . . was to limit the liability of vessel owners to their interest in the *adventure*, and thus to encourage ship-building and to induce capitalists to invest money in this branch of industry.") (internal quotations and citations omitted).

[6] *See, e.g.*, *id.*

the owner would remain subject to the full extent of liability.[7] Now that it has elected to invoke the shield, the shipowner should not be hampered, before those proceedings get underway, from making a last-minute settlement with one of the claimants, if such a settlement would (1) obtain for it better terms than it could get in the Limitation Act proceeding and (2) not otherwise prejudice the remaining claimants.

On the other hand, the goal of equitable resolution argues against enforcing the forum-selection clause. Once the shipowner invokes the protection of a Limitation Act proceeding, all claims subject to the shield should be resolved at one time and by one court. Arguably, if the shipowner is going to get the benefit of limited liability against the PantasSSeven if it is at some later date (such as if and when the Peruvian courts find this agreement unconscionable and thus grant rescission)SSthen all claimants deserve an equal shot at the limited fund. Otherwise, the shipowner can do indirectly what it could not do directlySSfavor some settlement creditors at the expense of others.[8]

Given these two competing policy concerns, it is hard to say that equitable resolution is a "strong" public policy that the enforcement of the forum-selection clause would contravene. The

---

[7] Underlying the Pantas' "fraud in the inducement" and "contrary to public policy" challenges to the forum-selection clause is their claim of lack of notice of the Limitation Act proceedings. Their alleged lack of notice, however, relates more to Afram's ability to invoke the Limitation Act shield against the Pantas, when and if they are successful in a Peruvian court at overcoming the settlement.

[8] Some creditors may be favored over the Pantas because they will have the first chance at the Limitation Act fund while the Pantas are litigating their claim in Peru.

more fundamental policy underlying the Limitation Act, that is, that of providing subsidization to the shipping industry, seems to diminish the strength of the equitable resolution principle and, as a result, to prevent it from overcoming the presumption in favor of the forum-selection clause's enforceability.[9]

## C.

The Pantas also claim that Afram should be judicially and equitably estopped from asserting any rights it may have under the forum-selection clause because Afram has taken inconsistent positions on the forum-selection clause matter throughout the Limitation Act proceeding.  We disagree.

## 1.

Judicial estoppel applies to protect the integrity of the courtsSSpreventing a litigant from contradicting its previous, inconsistent position when a court has adopted and relied on it. *See United States ex rel. Am. Bank v. C.I.T. Constr. Inc.*, 944 F.2d

---

[9] *But cf. THE QUARRINGTON COURT*, 102 F.2d 916, 919 (2d Cir. 1939) ("[A]fter the limitation proceeding has begun steps outside of that proceeding which would affect the fund should not be allowed [to be carried out through an arbitration clause] for they would involve a negation of one of the important purposes of such proceedings and a well established practice."). *THE QUARRINGTON COURT* was decided in an era in which forum-selection and arbitration clauses were disfavored by the courts because they were thought to "oust their jurisdiction." In those days, nearly any public policy could undo such a clause. *See* RICHMAN & REYNOLDS, UNDERSTANDING CONFLICT OF LAWS § 30, at 77-78 (2d ed. 1993).

By 1972, the Supreme Court had rejected the "ouster of jurisdiction" notion as parochial. *See THE BREMAN*, 407 U.S. at 9.  Now, there is a heavy presumption in favor of such clauses; these days, the barrier has been raised: A *strong* public policy, not just any public policy, is needed to justify overcoming the presumption in favor of such clauses. *See id.; Mitsui*, 111 F.3d at 35.

10

253, 258-59 (5th Cir. 1991).[10]  "The doctrine of judicial estoppel 'applies in cases where a party attempts to contradict his own sworn statements in the prior litigation.'"  *Id.* at 258 (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)). "To achieve this purpose, many courts inquire whether the party 'successfully maintained' its contrary position" previously.  *Id.* at 258 (citation omitted).[11]

The Pantas argue that when it filed its Limitation Act complaint, Afram misrepresented to the district court that there were no other "legal proceedings" underway.  The Pantas contend that the subsequent settlement was a "legal proceeding" and that it was in violation of the representations in the complaint.[12]

Assuming *arguendo* that the Pantas are correct that the subsequent settlement is a "legal proceeding," they still have failed to make an additional showing needed to obtain judicial estoppel:  They have not demonstrated the court's acceptance and reliance on Afram's misrepresentation.  "[W]e find no evidence in

---

[10] *See also McNamara v. City of Chicago*, 138 F.2d 1219, 1225 (7th Cir. 1998) ("The doctrine provides that a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground.  If repudiation were permitted, the incentive to commit perjury and engage in other litigation fraud would be greater.").

[11] There appears to be some tension in the doctrine about whether judicial estoppel can bar a litigant from raising an inconsistent position in the same court proceeding, or whether the bar can arise only in a subsequent proceeding. *Compare id.* (two proceedings assumed) *with, e.g.*, *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996) (applying the doctrine to a FED. R. CIV. P. 60 motion for relief from judgment).  Because, in the instant case, the conduct does not, in any event, appear to meet the other criteria needed to invoke the bar, we will assume *arguendo* that a single court proceeding is sufficient.

[12] We assume *arguendo* that the representations that a plaintiff makes in its complaint are subject to the doctrine of judicial estoppel.

11

the record that demonstrates [the court's] acceptance of the position taken [by Afram in its complaint]." *American Bank*, 944 F.2d at 258.[13]

2.

The Pantas' equitable estoppel claim also fails; it appears to be nothing more than a renamed fraudulent inducement claim. The Pantas base their equitable estoppel argument on Afram's failure to disclose to them, when entering into the settlement agreement, that the Limitation Act proceeding was underway. The same conduct also forms the basis for the Pantas fraudulent inducement attack on the entire settlement that we discuss above. *See supra* part II.A. We rejected that claim because it attacked the entire contract as fraudulently induced, rather than focusing on the forum-selection clause by itself. *See id.*

Estopping Afram from asserting the forum-selection clause, based on the same conduct underlying the fraudulent inducement claim, would contravene our holding in *Haynsworth* that allegations that the entire contract was fraudulently induced are "inapposite to [a forum-selection clause] enforceability determination, which must . . . precede any analysis of the merits." *Haynsworth*, 121 F.3d at 964. Our conclusion is based on the reality that, under a contrary holding, a plaintiff claiming that an entire

---

[13] *See also id.* ("The 'judicial acceptance' requirement minimizes the danger of a party contradicting a court's determination based on the party's prior position and, thus, mitigates the corresponding threat to judicial integrity.") (citation omitted).

12

contract was fraudulently induced could simply restyle, as a claim of equitable estoppel, his insufficient fraudulent inducement attack on the contract as a whole.

## D.

The Pantas maintain that they will be prevented from having their day in court if forced to return to a Peruvian forum, because they cannot obtain contingency-fee counsel in the Peruvian courts and cannot afford to pay a Peruvian lawyer in advance. Therefore, they will be barred from litigating their claim in those courts.

The record contains no information about the Pantas' inability to obtain counsel to represent them in the Peruvian courts. Accordingly, we will not consider that matter.[14]

## E.

The Pantas aver that the release does not apply to tort suits that they file outside Peru. The idea apparently is that the release applies only if the Pantas include as part of their cause of action a claim that requires construction of the settlement agreement. If the settlement agreement arises only as an affirmative defense to a tort claim, however, the release provisions do not apply.

There is no error here because the argument relies on our construction of the release to determine whether the release

---

[14] *See, e.g.*, *United States v. Gerald*, 624 F.2d 1291, 1296 n.1 (5th Cir. 1980) ("It is appellant's responsibility to insure the inclusion in the record of all matters he intends to rely upon on appeal.").

applies only to "cause of action" claims or to all claims in which it might arise. The forum-selection clause, however, dictates that any disagreements about the release must be brought in a Peruvian courts. In short, to address this argument would force us to overlook the forum-selection clause and to construe the underlying agreement when we are foreclosed from doing so.

AFFIRMED.