**Alistair J. MACPHAIL Plaintiff,**

v.

**OCEANEERING INTERNATIONAL, INC. Defendant.**

No. G–01–266.

United States District Court,
S.D. Texas,
Galveston Division.

Oct. 17, 2001.

Joseph W Walker, Franklin Mosele & Walker, Houston, TX, Gary J Siller, Strasburger & Price LLP, Houston, TX, for Alistair J MacPhail, plaintiff.

James Patrick Cooney, Royston Rayzor et al, Houston, TX, for Oceaneering International, Inc., defendant.

1. Section 1406(a) reads as follows: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of

*ORDER DENYING OCEANEERING INTERNATIONAL'S RULE 12(b)(3) MOTION TO DISMISS*

KENT, District Judge.

Plaintiff Alistair MacPhail ("MacPhail") brings this lawsuit pursuant to the General Maritime Law of the United States of America, the Jones Act, 46 U.S.C.App. § 688, and the state laws of Texas. Plaintiff seeks monetary damages for injuries suffered in the course of his employment as a saturation diver on the dive support vessel OCEAN WINSERTOR, owned and operated by Defendant Oceaneering International, Inc. ("Oceaneering"), a large multi-national corporation headquartered in Houston, Texas. Now before this Court is Defendant's Rule 12(b)(3) Motion to Dismiss pursuant to an Australian Forum Selection Clause contained in a Deed of Release and Discharge ("Release") executed by the Parties on November 3, 1999. For the reasons articulated below, Defendant's Motion is hereby **DENIED**.

**I.**

■ Title 28, United States Code § 1406(a) instructs District Courts to dismiss or transfer a case if venue is improper where filed.[1] A party may move to dismiss an action based on improper venue pursuant to Fed.R.Civ.P. 12(b)(3). The burden of demonstrating that venue is improper and transfer is therefore warranted lies with the movant. *See Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir.1966); *Texas Marine & Brokerage, Inc. v. Euton*, 120 F.Supp.2d 611, 612 (E.D.Tex.2000); *Sanders v. Seal Fleet, Inc.*, 998 F.Supp. 729, 733 (E.D.Tex.1998); *Bounty–Full Entm't, Inc. v. Forever Blue Entm't*

justice, transfer such case to any division in which it could have been brought." 28 U.S.C. § 1406(a).

*Group,* 923 F.Supp. 950, 957–958 (S.D.Tex. 1996).

This Court observes that the Fifth Circuit has not conclusively established that Fed.R.Civ.P. 12(b)(3) is in fact the precise procedural rule governing motions to dismiss based upon the enforcement of forum selection clauses. However, the decision reached by the Fifth Circuit in *Mitsui & Co. (USA), Inc. v. MIRA M/V,* 111 F.3d 33 (5th Cir.1997), suggests that the Fifth Circuit would indeed adopt such a view. In that case, the District Court characterized its dismissal pursuant to a forum selection clause as a Rule 12(b)(3) motion to dismiss. *See Mitsui & Co.(USA), Inc. v. M/V MIRA,* No. CIV.A.95–4224, 1996 WL 444193, at *1 (E.D.La. Aug.7, 1996). Although the Fifth Circuit did not address the exact procedural issue upon appeal, the Court fully affirmed the District Court's decision to dismiss the lawsuit. *See Mitsui,* 111 F.3d at 37.

The Seventh, Ninth and Tenth Circuits agree that a motion to dismiss pursuant to a forum selection clause falls within the purview of Rule 12(b)(3). *See e.g., R.A. Argueta v. Banco Mexicano, S.A.,* 87 F.3d 320, 324 (9th Cir.1996) (concluding that a motion to dismiss premised upon enforcement of forum selection clause is governed by Rule 12(b)(3)); *Frietsch v. Refco, Inc.,* 56 F.3d 825, 830 (7th Cir.1995) (deciding that Rule 12(b)(3) is the proper procedural tool for a motion to dismiss based upon a forum selection clause); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956 (10th Cir.1992) (same). On the other hand, the First, Second and Third Circuits endorse different positions. *See Salovaara v. Jackson Nat'l Life Co.,* 246 F.3d 289, 299 (3d Cir.2001) (concluding that Rule 12(b)(6) dismissal is a permissible means for enforcing a forum selection clause); *New Moon Shipping Co. v. MAN B & W Diesel AG,* 121 F.3d 24, 28–29 (2d Cir.1997) (remarking that the burden "is analogous to that imposed on a plaintiff to prove that the federal court has subject matter jurisdiction over his suit"); *Lambert v. Kysar,* 983 F.2d 1110, 1112 n. 1 (1st Cir.1993) (noting that dismissal due to forum selection clause is a Rule 12(b)(6) motion, not a 12(b)(3) motion); *Avc Nederland B.V. v. Atrium Inv. P'ship,* 740 F.2d 148, 152–59 (2d Cir.1984) (permitting dismissal pursuant to Rule 12(b)(1)). Although the Circuit split is evident, this Court concludes that, in light of the *Mitsui* decision, coupled with persuasive authorities from the Seventh, Ninth and Tenth Circuits, Oceaneering's Motion to Dismiss pursuant to a forum selection clause is properly characterized as a Rule 12(b)(3) motion to dismiss.

**II.**

 Federal law governs this Court's inquiry into the enforceability of a forum selection clause. *See Haynsworth v. The Corp.,* 121 F.3d 956, 962 (5th Cir.1997). Forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *The BREMEN v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972). "The burden of proving unreasonableness is a heavy one, carried only by a showing that the clause results from fraud or overreaching, that it violates a strong public policy, or that enforcement of the clause deprives plaintiff of his day in court." *Mitsui,* 111 F.3d at 35 (citing *BREMEN,* 407 U.S. at 12–13, 15, 18, 92 S.Ct. at 1914–15, 1916, 1917–18), *see also Afram Carriers, Inc. v. Moeykens,* 145 F.3d 298, 301 (5th Cir. 1998).

**III.**

In its Motion to Dismiss, Oceaneering argues that this Court may not judge the

soundness of the forum selection clause in the Release by the merits of the underlying settlement agreement, because any inquiry into the merits is best left to the forum selected by the parties. As such, Oceaneering insists that the clause automatically warrants a dismissal of this action without further inquiry into the circumstances surrounding this litigation. In response, MacPhail argues that this Court should and must examine the background facts giving rise to this lawsuit, because the relevant circumstances surrounding not the soundness of the forum selected, but the capacity of the Plaintiff to participate in that selection, or indeed in the creation of the entire Release document, preclude a finding that the forum selection clause is valid. Specifically, MacPhail argues that the clause is unenforceable because: (1) Oceaneering procured the Release, including the forum selection clause, through fraud and overreaching; (2) enforcement of the clause would violate public policy; and (3) enforcement of the clause would effectively deprive MacPhail of his day in court. After an exhaustively careful in-depth examination of the affidavits and other materials submitted by both Parties regarding this matter, this Court agrees with MacPhailthe circumstances of this lawsuit are so dire, and the alleged conduct of Oceaneering so egregious, that this Court simply must consider the clause's enforceability in light of the averments presented by MacPhail's affidavits.

The affidavits submitted by MacPhail aver the following set of facts: While working for Oceaneering on May 18, 1998, MacPhail was committed under pressure to saturation diving in the China Sea.[2] Along with three diving partners, MacPhail was "stored" at a depth of approximately 100 feet with a breathing mix of helium and oxygen. During the thirty day period that MacPhail remained in saturation, he and his diving partners undertook approximately fifteen "bell runs" in which they would descend to the bottom in a diving bell, exit the bell for several hours of work and then return to the vessel to await their next run.

As MacPhail entered the diving bell for his second bell run, he observed oil, mud and sludge coating the hoses and the inside of the bell. While on the bottom during the run, MacPhail experienced severe headaches, loss of concentration and decreased coordination. Upon returning to the bell, MacPhail felt disoriented. After the bell was returned to the vessel, MacPhail experienced headaches, loss of appetite, nausea and vomiting. MacPhail promptly and specifically reported his problems to surface management and the deck crew cleaned the interior of the bell.

Throughout the entire remainder of the saturation period, MacPhail continued to experience headaches, nausea, the loss of dental fillings and other severe and immediate medical problems. Although MacPhail repeatedly reported his troubles to management, the dive was not shut down and Oceaneering sent MacPhail on numerous subsequent dives. Later analysis of the seabed showed that the mud contained toxic levels of various metals including arsenic and mercury, cyanide, hydrogen sulfide and polychlorinated biphenyls.

When MacPhail was brought to the surface after thirty days, he was weakened, disoriented and exuding a "disgusting" odor. Clearly, he was in dire need of medical attention. MacPhail was transported first from the vessel to Hong Kong,

2. Saturation diving requires a diver to spend extended periods of time under pressure before resurfacing.

where he received one day of medical attention, and then to Singapore, for additional treatment.

Upon returning to Australia (his residence at the time), MacPhail visited additional doctors provided by Oceaneering, but his condition continued to worsen. Over the ensuing months, MacPhail suffered sleep loss, depression, pain in his teeth, episodes of intense anger, excruciating headaches, fainting spells and a host of other complications. MacPhail continued to make requests to Oceaneering for experts in hyperbaric medicine and toxicology, but was repeatedly told that Oceaneering was either looking for or unable to locate appropriate specialists. Ultimately (and incomprehensibly), Oceaneering failed to refer MacPhail to even one specialist experienced in diving medicine, chemical poisoning, or hyberbaric medicine.

Oceaneering appointed Cocks Macnish, an Australian law firm, to liaise with MacPhail. Two Oceaneering employees, Overland and Leung, assured MacPhail that the Cocks Macnish lawyers were not adversarial but rather, were appointed to allocate resources and seek out the best medical help available. However, Patricia Saraceni, the Cocks Macnish solicitor handling the case, blithely responded to MacPhail's repeated requests for help by informing him that Oceaneering could not continue to help him and that the situation required closure. Furthermore, Overland and Leung repeatedly telephoned MacPhail, deprecating his problems and offering him a sum of money to "put it all behind us." Later, after Saraceni, Overland and Leung informed MacPhail that there was nothing more medically that could be done, and threatened to cut off future medical and financial assistance. Sick, frightened and intimidated, MacPhail agreed to sign the Release. MacPhail was not represented by counsel at that time.

The Release was prepared by Saraceni and executed in Western Australia on November 3, 1999. In consideration of the Release, MacPhail received $280,000.00, a commitment on the part of Oceaneering to provide MacPhail with additional training courses and an escrow fund in the amount of $25,000.00 to cover future medical expenses. The forum selection clause contained in the Release reads:

> In the event of any dispute in respect of or arising from this Deed of Release and Discharge or any matter relating thereto the parties hereby agree to submit their dispute to the exclusive jurisdiction of the District Supreme Court of Western Australia, or to the Federal Court of Australia and the parties hereby agree to submit to the exclusive jurisdiction of the said courts.

The execution of the Release was followed by the entry of a judgment in the District Court of Western Australia, Perth.

By the spring of 2000, MacPhail was a shadow of his former self. Severely depressed and in constant pain, MacPhail found himself unable to work or carry on normal relationships with others. That year, he became aware that one of his similarly situated diving partners had received helpful treatment in the United States from the Van Meter hyperbaric group. MacPhail subsequently traveled to the United States and was treated by the Van Meter specialists for one month, beginning on November 15, 2000. MacPhail was diagnosed with multiple physical abnormalities, including significant brain and nerve damage, all linked to toxic chemical exposure and decompression sickness. Tragically, one Van Meter physician noted that MacPhail's "short, medium and long term prognosis would have been very different had he been immediately treated."

MacPhail later discovered that Oceaneering had *never* contacted any hyper-

baric specialist or expert toxicologist, but rather, relied upon individuals with no diving medical experience to coordinate his treatment, even though Oceaneering actually knew of such specialists and had used them in the past. Furthermore, Oceaneering originally provided Plaintiff with an incomplete chemical analysis of the substances he had been exposed to while diving, even though Oceaneering had possessed the complete analysis. This omission may have substantially impeded his treatment and recovery. In light of these discoveries, MacPhail was moved to file this lawsuit. Oceaneering responded by filing its Motion to Dismiss for improper venue pursuant to the forum selection clause recited above.

## IV.

■ As previously stated, a forum selection clause is unreasonable, and therefore unenforceable, in any of three circumstances: (1) the clause is the result of fraud or overreaching; (2) enforcement of the clause would violate a strong public policy; or (3) enforcement of the clause would deprive the plaintiff of his day in court.

### A. Fraud & Overreaching

■ A forum selection clause is unenforceable for fraud only "if the inclusion of that clause in the contract was the product of fraud or coercion." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 2456 n. 14, 41 L.Ed.2d 270 (1974). Stated differently, a court may consider a claim that a party was fraudulently induced to include a forum selection clause in an agreement, but may not enter-

tain a claim that the entire agreement was procured by fraud.

The Fifth Circuit's analysis in *Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298 (5th Cir.1998), illustrates these principles. In that case, Peruvian port authorities had ordered Afram to fumigate its ship. *See id.* at 300. All crew members were evacuated except for the captain, the chief engineer, and four employees of Servipro, a contract security service. Augustin Panta, a Servipro employee, died from inhalation of the toxic substance used for fumigation. Afram then entered into a settlement agreement, containing a Peruvian forum selection clause, with Panta's wife and children for $2000, in exchange for releasing all claims in Peruvian and United States courts. *See id.* At the same time, Afram instituted a limitation of liability proceeding under the Limitation of Liability Act, 46 U.S.C. §§ 181–189, in the United States District Court for the Southern District of Texas. *See Afram*, 145 F.3d at 300. When the Pantas became aware of the proceeding, they moved to intervene. However, the court denied the motion to intervene based on the forum selection clause found in the settlement agreement. *See id.*

Upon its review of the lower court's decision, the Fifth Circuit found the forum selection clause valid despite extensive evidence of fraud and overreaching.[3] The Court commented that this was evidence of disagreement over the entire settlement, but not over the forum selection clause itself. *See id.* at 301–02. The Court further noted that while the facts were certainly dire, the settlement offer of $2000,

---

3. The Pantas presented evidence that the forum selection clause was obtained by fraud, including evidence that Afram told the Pantas that they could not sue the ship because the shipowner was American, that Afram failed to notify them of the Limitation of Liability pro-

ceeding and that they would have filed claims in the limitation proceeding but for the misrepresentations and failures to disclose. *See Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 302 n. 3 (5th Cir.1998).

which was made in the weeks following Panta's death and accepted by his family in exchange for waving all claims, was not procured by fraud or duress. *See id.* at 300. As such, the Court held that even if the forum selection clause was part of an illegally obtained contract, it was impermissible to draw a further inference that the clause itself was obtained via fraud or overreaching. *See id.* at 301–02.

In light of *Afram*, this Court has no choice but to reject MacPhail's fraud argument. Although MacPhail, much like the *Afram* plaintiffs, has presented multiple affidavits suggesting fraud, coercion, and manifest overreaching by Oceaneering, none of these averments support a finding that MacPhail was induced to include the forum selection clause itself in the Release. Ultimately, MacPhail's challenge is not separate and distinct from his challenge to the entire agreement. As such, this Court must decline to set aside the clause on the basis of fraud or overreaching by Oceaneering.

### B. *Public Policy*

■ In *Afram*, after rejecting the plaintiffs' fraud argument, the Fifth Circuit turned to a discussion of public policy. *See id.* at 302. Noting that a forum selection clause is potentially unreasonable when it undermines a strong public policy of the forum, the Court undertook a determination of whether the equitable resolution afforded by the Limitation Act was a "strong" public policy that justified overcoming the forum selection clause at issue. *See id.* In doing so, the Court considered the two goals of the Limitation Act the goal of subsidizing shipowners and promoting settlement, and the goal of equitable resolution. *See id.* Ultimately, the Court concluded that "[g]iven these two competing policy concerns, it is hard to say that equitable resolution is a 'strong' public pol-

icy contravening the enforcement of a forum selection clause. The more fundamental policy underlying the Limitation Act-providing subsidization to the shipping industry-seems to diminish the strength of the equitable resolution principle, and, as a result, to prevent it from overcoming the presumption in favor of the forum selection clause's enforceability." *Id.* at 303. Thus, the Fifth Circuit rejected the Pantas' claim that the Peruvian forum selection clause was unenforceable as a violation of public policy. *See id.*

■ However, this lawsuit is markedly different from *Afram*. MacPhail's lawsuit, unlike *Afram*, is not a Limitation Act proceeding, but rather, a tort suit brought by an injured seaman. The competing policies behind the Limitation Act-equitable resolution and the protection of shipowners-are not implicated at all in the present action. Thus, the public policy analysis undertaken by the Fifth Circuit in *Afram* is not directly instructive to the present lawsuit. Instead, the analysis required in the instant action invokes the policy underlying the General Maritime Law and the Jones Act. Specifically, this Court must determine whether the long-standing public policy of affording seaman, as wards of the Admiralty court, special protection from the hazards of life at sea justifies overcoming the forum selection clause in the Release.

■ A strong policy favoring the protection of seaman is deeply entrenched in our legal system. In *Castillo v. Spiliada Mar. Corp.*, 937 F.2d 240 (5th Cir.1991), the Fifth Circuit affirmed this policy, declaring that "[s]eaman, as wards of the court, are entitled to a careful review when a district court refuses to exercise jurisdiction over their claims. We are convinced that federal courts must remain vigilant in protecting the rights of seaman, whether foreign or domestic, in their relations with

their employer." *Id.* at 247. This Court elaborated upon this perennial notion in *Sabocuhan v. Geco–Prakla,* 78 F.Supp.2d 603 (S.D.Tex.1999), stating: "These seaman often labor aboard dilapidated vessels in deplorably dangerous working conditions, and yet at considerable risk to life and limb they assist in bringing products to this country which inure to the benefit of all United States citizens. Denying an injured seaman a forum is utterly contrary to the beneficent attitude towards seamen that has for centuries characterized the Admiralty courts of the English speaking world." *Id.* at 606.

As a saturation diver, MacPhail was engaged in a highly dangerous profession that required him to remain underwater for long periods of time. He bravely faced the perils of the sea while furthering Oceaneering's interests in far-away waters, and was tragically and permanently injured as a result. Affidavits submitted by Mac-Phail establish that he was told by Oceaneering agents that if he did not sign the Release, medical and financial assistance from Oceaneering, the corporation he had risked his life for, would cease. Not knowing whether his condition was going to worsen or improve. MacPhail understandably feared he couldn't risk losing future medical assistance. Therefore, while racked with pain, haunted by depression and unrepresented by counsel, MacPhail reluctantly agreed to enter into an agreement he simply lacked the capacity to fully evaluate. These averments establish that MacPhail unquestionably falls within the group of plaintiffs that our venerable and

strong public policy favoring the rights of seamen was fashioned to protect. To deny MacPhail an opportunity to litigate his claims in this forum by enforcing the unreasonable forum selection clause in the Release would eviscerate the fundamental notion that the rights of seaman are worthy of special protection by the Admiralty courts.[4]

### C. *A Meaningful Day in Court*

 A forum selection clause is unreasonable if "trial in the chosen forum would be so difficult and inconvenient that the party would effectively be denied a meaningful day in court." *See Argueta,* 87 F.3d at 325. MacPhail's affidavits aver that MacPhail is unable to pursue a remedy in relation to his injuries either in the Federal Courts of Australia or in the Western Australian Courts because (1) the Release was not concluded in Australia and has no connection to Australia; (2) Oceaneering has no legal presence in Australia; (3) the only connection between Oceaneering and Australia is that Oceaneering is a shareholder in Oceaneering Australia Pty Ltd., a separate legal entity which has no connection with MacPhail's injuries; (4) MacPhail is not a citizen of Australia; (5) the acts and circumstances giving rise to the injuries took place outside the jurisdiction of the Australian courts; and (6) there is no indication that it was the common intention of the Parties that the Release would be governed by Australian law. If MacPhail attempted to commence proceedings in Australia, it appears clearly to this Court that those pro-

---

**4.** In *Sabocuhan,* this Court reluctantly held the forum selection clause at issue enforceable, even though to do so appeared contrary to public policy, because the Court was bound to do so by the Fifth Circuit's decision in *Marinechance Shipping Ltd. v. Sebastian,* 143 F.3d 216 (5th Cir.1998). *Sabocuhan* and *Marinechance* both involved forum selection

clauses in employment contracts incorporating the Migrant Workers' and Overseas Filipinos' Act of 1995. However, while the opinion in *Marinechance* was squarely on point in *Sabocuhan,* the *Marinechance* decision is distinguishable from the facts of the instant action, which involves a forum selection clause in the context of a settlement agreement.

ceedings would either be dismissed for lack of jurisdiction or, in the alternative, stayed and transferred to another forum. *Id.* at 5. In light of these averments, a real possibility exists that MacPhail will be unable to secure his rights in an Australian forum. Oceaneering has offered no evidence to the contrary.[5] As such, it would be unjust and unreasonable for this Court to decline jurisdiction over this case in favor of a forum selection clause choosing an implausible and unworkable forum.

In sum, this Court finds the forum selection clause at issue unreasonable and therefore unenforceable because its enforcement would violate a strong public policy and because Plaintiff would thereby be deprived of his day in court. To find such a clause valid and enforceable in the precise facts of this case would amount to an unmistakable violation of our strong public policy protecting the rights of seamen as wards of the American admiralty courts, and furthermore, would effectively deprive MacPhail of his rightful day in a court of proper jurisdiction. As such, Oceaneering's Motion to Dismiss is hereby **DENIED**.

**IT IS SO ORDERED.**

---

**5.** The Court notes that in its Motion to Dismiss, both parties stipulated to jurisdiction in an Australian forum. However, MacPhail does not aver that an Australian Court would dismiss MacPhail's suit based upon a lack of personal jurisdiction. Rather, MacPhail avers that an Australian Court would dismiss the lawsuit based upon a lack of subject matter jurisdiction over the substance his claims. Thus, Oceaneering's submission to jurisdiction in Australia will not cure the potential jurisdictional obstacles that MacPhail faces in Australia. It is axiomatic that agreement of the Parties is not enough to sustain jurisdiction. MacPhail must be able to invoke Australian jurisdiction as a matter of law, which to this Court appears impossible.